IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| CALEB WILSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 3:04-CV-59 |
| | ) | |
| DR. JOSEPH E. JOHNSON, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This civil action is before the court for consideration of the motion for summary judgment filed by defendants [doc. 40]. Plaintiff has submitted a response [doc. 68], and defendants have filed a reply [doc. 72]. Plaintiff has brought suit pursuant to 42 U.S.C. § 1983 for alleged violation of his rights under the First, Fourth and Fourteenth Amendments of the United States Constitution. For the reasons stated herein, defendants' motion will be granted, and this case will be dismissed.

I.

*Background*

The facts presented are limited to those the court deems necessary for its findings. Plaintiff graduated high school in 1995 and spent two years in the Air Force where he handled nuclear weapons before entering the University of Tennessee in 1998. He did not

complete his studies at the University but returned in the fall of 2002 to study media art in order to pursue a career in film making and/or television production.

On February 13, 2003, plaintiff and two friends were drinking at a bar, The Long Branch, located near campus. They had arrived at the bar about 11:00 or 11:30 p.m. and stayed until about 1:30 a.m. When they left the bar, they went to the University's Art and Architecture Building to make anti-war signs. The threesome went to the drawing room on the fourth floor and used plaintiff's paint and butcher paper from the art supplies available to students and proceeded to make several anti-war banners. At some point, plaintiff went downstairs and with yellow paint wrote "no war" on the exterior wall of the building. He also wrote "no war" on the elevator doors. With the help of his friends, plaintiff also taped banners from the interior railings of the building and on the bulletin board and exterior of the building. Plaintiff then went across the street alone to the Stokely Athletic Center where he wrote "no war" with yellow paint on the front doors.

At about 2:40 a.m., a janitor, Rick Nuhn, observed plaintiff and his friends putting up a "no war" poster, but he said nothing to them. It was after he noticed yellow paint splattered on the floor and writing with the yellow paint in the elevator that he called the police. Mr. Nuhn's witness statement provides in part:

> I saw 2 young men in early 20's, one young woman in twenties putting up a "NO WAR" poster at 2:40. I said nothing to them; however at approximately 3 AM as I was entering the elevator on the second floor they were coming out and I noticed yellow paint splattered on the floor. I turned to them and said "You're getting yellow

paint on the floor and the young man with black glasses turned and said sarcastically "I'll clean it up." So I said do it now before it dries but obviously he and the others weren't coming back. Then when I turned into the elevator I saw the "No War" in yellow paint in the elevator. Then I called the police.[1]

Plaintiff was on the fourth floor when he saw a police officer on the first floor. Plaintiff then went downstairs and left the building from the second floor north exit. He testified he was not running nor was he walking casually; he was trying to catch up with his friends.

Officer Robert E. Cummings of the University of Tennessee Police Department was the arresting officer. He was notified by his dispatcher that there was vandalism in progress at the Art and Architecture Building. When Officer Cummings arrived, he saw plaintiff through the windows. He testified plaintiff was running.[2] After plaintiff was stopped and handcuffed, he and Officer Cummings went inside the Art and Architecture Building where Mr. Nuhn identified plaintiff. In addition, plaintiff had yellow paint on his hands.

---

[1] Plaintiff testified in deposition that the janitor told him and his friends that he was going to take the posters down. However, as discussed in the following analysis, this does not create a material issue of fact.

[2] As will be discussed herein, the circumstances surrounding plaintiff's arrest are not at issue. Plaintiff pled guilty to evading arrest, and he is estopped from now claiming there is a question of fact concerning whether there was probable cause to arrest him.

3

Plaintiff was taken to the University of Tennessee police station where he was read his rights. After signing a waiver of his rights, plaintiff wrote out the following statement:

> As an Artist I was driven to send a message. This being a message of protest during a time of war may have brought added attention to my message. The instances of "vandalism" were done in places that are easy to clean or on top of previously vandalized areas. This was done consciously by myself to minimize damage and possible repair costs. If one were to tour the Art and Architecture building at the University of Tennessee they would see that Artistic expression abounds throughout the building - even on permanent walls. To many this is seen as art, especially in the Art building. If my Artwork is perceived by the Dean of Art as vandalism then I will repair the minimal damage I may have caused.

Officer Cummings saw Mr. Nuhn in the Art and Architecture Building holding plaintiff's banners folded up, and he was going to throw them away. Officer Cummings testified that he did not remove any of the banners. Edward Yovella, who was chief of the University of Tennessee Police Department at the time of the subject incident, testified he was called at home about the incident by Lieutenant Severs, the third shift supervisor. The following exchange occurred at Chief Yovella's deposition:

4

Q.      Okay.  What is it that Lieutenant Severs told you at that time?

A.      He told me there had been considerable vandalism to the A&A building and Stokely Athletic Center.

Q.      Did he describe specifically what that was or did he just use those words?

A.      It was pretty much those words.  And I asked him what kind of vandalism, and he said that there was a lot of paint, I remember a lot of paint on the building.

Q.      Okay.  Did he tell you anything about banners being hung from the building?

A.      It came up, but it wasn't mentioned right at that time.

Q.      Okay.  When did that, the ID of banners come up?

A.      I asked him if he had gotten all of the evidence out of the building, and he told me that there was still some banners there, I asked him if he thought – I asked him if he thought those could be used as evidence, he said well, they might have fingerprints or something on them, I'll go back and get them.

Q.      And, to your knowledge, did somebody from the police department go back and get them?

A.      I later on found out that, yes.

Q.      Okay.  Who, who did it turn out from the police department went back to get the banners?

A.      I have no idea.

5

. . .

Q.      Okay.  Did you and Lieutenant Severs discuss anything else in that conversation?

A.      He mentioned when I asked him to go back and get the banners, he mentioned that the custodians were – they were getting ready to clean the building, they may have already gotten rid of those, and I said don't – try to get back down there and make sure they don't get rid of them.
. . .

A.      I really had no idea who took the banners down.

Q.      Okay.  But what you do know is that in this telephone conversation, Lieutenant Severs told you that there were banners and you asked him if they had evidentiary value, and what did he say when you asked him that?

A.      He told me that he – I don't know if they were getting ready to take them down when he was up there or what, but he made the statement to me that the custodians are getting ready to take the banners – not take the banner down, but getting ready to clean the building up, and it's possible they've already taken the banners down.

Q.      So did he tell him to go back and get the banners?

A.      I said don't let them do away with those banners, go back and get them if they haven't gotten rid of them.

Q.      And if they hadn't taken them down, were you telling him to go get them and take them down and make sure we've got them for

6

evidence?

A.      Yes, sir, I was.

Plaintiff was charged with vandalism, pursuant to Tenn. Code Ann. § 39-14-408; public intoxication, pursuant to Tenn. Code Ann. § 39-17-310; and evading arrest, pursuant to Tenn. Code. Ann. § 39-16-603. He later pled guilty to evading arrest, and the other two charges against him were dropped. He was also ordered to pay restitution of $200.00 to the University of Tennessee for the damage to its facilities.[3] Plaintiff received judicial diversion, which he successfully completed, and his record was expunged.

At the time of the subject incident, the student handbook, HillTopics, stated the following:

INTRODUCTION

The responsibility to secure and to respect general conditions conducive to the freedom to learn is shared by all members of the academic community. This University has a duty to develop policies and procedures that provide a safe-guard to this freedom. Such policies and procedures are developed at this institution with the participation of all members of the academic community.

By registering in the University, the student neither loses the rights nor escapes the duties of a citizen. Each student should conduct his/her personal life in the context of mutual regard for

_____

[3] In his deposition taken December 17, 2004, plaintiff testified he had not paid the restitution.

7

the rights and privileges of others. Therefore, it is expected that students will demonstrate respect for the law and for the necessity of orderly conduct in the affairs of the community.

Students are responsible for being fully acquainted with the University catalog, handbook, and other rules and regulations relating to students, and for complying with them in the interest of an orderly and productive community. In addition to those rules and policies listed below, each student shall be held responsible for those policies either listed elsewhere in University publications or promulgated and announced by authorized university personnel. . . .

Failure or refusal to comply with the rules and policies established by the University may subject the offender to disciplinary action up to and including permanent dismissal from the University.
. . .

Standards of Conduct

    Exclusion from the University or any lesser penalty may result from any of the following misconduct:
. . .

5.    Vandalism, malicious destruction, damage, or misuse of private or public property, including library material;

16.    Use, possession, or being under the influence of alcoholic beverages on University-owned or -controlled property;

20.    Violation of written University policies or regulations as stipulated herein or as promulgated

8

and announced by authorized personnel;

26. Commission of an act or an attempt to commit an act on University property or involving members of the University community (i.e., faculty, staff, student or campus visitor) that would be in violation of state or federal law.

Also at the time of the subject incident, portions of the Art and Architecture Building were covered with graffiti and paint. Defendant Marlene Davis, who was dean of Architecture at the time in question, testified that she considered the graffiti and painting on the Art and Architecture Building vandalism; that the physical plant would remove the graffiti if called to do so; and that there were no approved places for graffiti. In addition, banners or signs concerning student and school-related topics were displayed in the Art and Architecture building and remained hanging after the subject incident.

Plaintiff testified that he believes he had the right to paint anything he wanted on any University building. He also testified that at the time he was doing it he was not concerned with whether painting on the Art and Architecture Building and Stokely Athletic Center was legal. Plaintiff also testified that he did not remember receiving a copy of HillTopics but he knew it was the student handbook and that it contained rules and regulations. He also admitted that he knew he could be expelled or otherwise penalized for vandalizing property. However, plaintiff testified that he did not know painting on the University's buildings was vandalism. The following exchange occurred at his deposition taken December 17, 2004:

Q. . . . You knew when you painted on the

elevators that that was vandalism, correct?

A.      No, ma'am.

Q.      You knew when you painted on the outside of the building that that was vandalism, correct?

A.      No, ma'am.

Q.      What did you consider it?

A.      Artistic expression.

Q.      And in your view of artistic expression, does that mean that you can paint any place in the university you want to?

A.      I'm not sure about that.

Q.      Could someone come along and paint on your car "Bomb Iraq" and that be (sic) okay?

A.      I'm not sure about that.

Q.      Would you want them to do that?

A.      No, ma'am.

Q.      Then why did you think the university would want you to paint on their elevator doors?

A.      I don't believe that I felt they wanted me to paint on the elevator doors.

Q.      In fact, you knew the university would consider that to be vandalism, didn't you?

A.      No, ma'am.

II.

*Standard of Review*

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Canderm Pharmacal, Ltd. v. Elder Pharms., Inc.*, 862 F.2d 597, 601 (6th Cir. 1988) (quoting Fed. R. Civ. P. 56(c). The moving party may discharge its burden by demonstrating that the non-moving party has failed to establish an essential element of that party's case for which he or she bears the ultimate burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The moving party need not support its motion with affidavits or other materials negating the opponent's claim. *Celotex Corp.,* 477 U.S. at 323, 106 S. Ct. at 2553. Although the moving party has the initial burden, that burden may be discharged by a "showing" to the district court that there is an absence of evidence in support of the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325, 106 S. Ct. at 2554.

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen-Bradley Co.*, 801

11

F.2d 859, 863 (6th Cir. 1986)).  In order to defeat the motion for summary judgment, the non-

moving party must present probative evidence that supports the complaint.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2510-11, 91 L. Ed. 2d 202

(1986).  The non-moving party's evidence is to be believed, and all justifiable inferences are

to be drawn in that party's favor.  *Liberty Lobby,* 477 U.S. at 255, 106 S. Ct. at 2513.  The

court determines whether the evidence requires submission to a jury or whether one party

must prevail as a matter of law because the issue is so one-sided.  *Liberty Lobby,* 477 U.S.

at 251-52, 106 S. Ct. at 2512.

III.

*Analysis*

Plaintiff has brought suit pursuant to 42 U.S.C. § 1983 for alleged violation of

his rights guaranteed under the First, Fourth, and Fourteenth Amendments to the

Constitution.  In order to sustain a § 1983 claim, plaintiff must establish that he was deprived

of a right secured by the United States Constitution and that the deprivation was caused by

a person acting under the color of law.  *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155, 98

S. Ct. 1729, 1733, 56 L. Ed. 2d 185 (1978); *Ellison v. Garbarino*, 48 F.3d 192, 194 (6th Cir.

1995).  As explained below, plaintiff has not shown a constitutional violation, and his § 1983

claims therefore fail.

A. Vandalism

Plaintiff contends that his First Amendment rights were violated when the "no

12

war" messages he painted on the walls and elevator of the Art and Architecture Building and the doors of Stokely Athletic Center were removed. The court disagrees.

In broad terms, the First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. "The freedom of speech . . . which [is] secured by the First Amendment against abridgment by the United States, [is] among the fundamental personal rights and liberties which are secured to all persons by the Fourteenth Amendment against abridgement by a State." *Burson v. Freeman*, 504 U.S. 191, 196, 112 S. Ct. 1846, 1850, 119 L. Ed. 2d 5 (1992) (quoting *Thornhill v. Alabama*, 310 U.S. 88, 95, 60 S. Ct. 736, 741, 84 L. Ed. 1093 (1940)). First Amendment freedom of speech applies to state university campuses. *Kincaid v. Gibson*, 236 F.3d 342, 347 (6th Cir. 2001). However, "the guarantees of the First Amendment have never meant 'that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please.'" *Greer v. Spock*, 424 U.S. 828, 836, 96 S. Ct. 1211, 1216-17, 47 L. Ed. 2d 505 (1976) ( quoting *Adderley v. Florida*, 385 U.S. 39, 48, 87 S. Ct. 242, 247, 17 L. Ed. 2d 149 (1966)).

Plaintiff's taking yellow paint and writing on the Art and Architecture Building and Stokely Athletic Center was vandalism pure and simple.[4] Plaintiff admitted as much in his written statement. His actions defaced those University buildings, and the fact that

---

[4] Vandalism is defined as follows: "willful or ignorant destruction of public or private property," *Blacks Law Dictionary* 1550 (7th ed. 1999), and "willful or malicious destruction or defacement of public or private property," *Merriam-Webster's Collegiate Dictionary* 1306 (10th ed. 1995).

others may have painted on portions of the Art and Architecture building with graffiti does not legitimize plaintiff's conduct. Simply because others have not been caught while defacing the building with paint does not mean that their actions were legal or condoned. For example, speeding is illegal. If a person speeds and does not get caught, he or she has still broken the law. The person's failure to be caught speeding does not make his or her conduct legal.

Plaintiff got caught defacing the doors and walls of two University buildings, conduct that constitutes vandalism, and vandalism is not protected by the First Amendment. *Riely v. Reno,* 860 F.Supp. 693, 702, (D. Ariz. 1994) ("[I]t is an untenable position that conduct such as vandalism is protected by the First Amendment merely because those engaged in such conduct 'intend[] thereby to express an idea.'" (citing *Texas v. Johnson*, 491 U.S. 397, 404, 109 S. Ct. 2533, 2539, 105 L. Ed. 2d 342 (1989)); *see also Council for Life Coal. v. Reno*, 856 F. Supp. 1422 (S.D. Calif. 1994). Plaintiff's conduct was not protected by the First Amendment, and his First Amendment rights were not violated when his painted messages were removed from the doors and walls of the University's Art and Architecture Building and Stokely Athletic Center.

Plaintiff also contends that he was denied due process protected by the Fourteenth Amendment because the policy in HillTopics concerning vandalism and damage to University property was void for vagueness. He argues that the provision "fails to provide fair notice to persons as to what constitutes unacceptable activity and fails to set clear

14

guidelines for law enforcement officials in exercising their enforcement authority." This statement, like plaintiffs' testimony that he did not know painting on the University's buildings was vandalism and against school policy, strains credibility and very "simply fails the straight face test." *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 977 (M.D. Tenn. 2002).

Plaintiff is an intelligent young man who graduated from high school, spent two years in the Air Force, and attended a major university; yet he wants this court to believe that he did not understand the policy in the student handbook concerning vandalism and damage to University property and that he did not realize painting on University buildings was vandalism. This position is disingenuous at best. There is nothing vague about the provision in HillTopics, and it did not fail to give fair notice concerning unacceptable conduct. Common sense, as well as common social understanding, supports this conclusion. Accordingly, Plaintiff was not denied due process on this basis.

B. <u>Banners</u>

Plaintiff assumes and therefore contends that his banners were taken down because of their content and that this was a violation of his First Amendment rights. However, the record does not support this contention. The proof shows that the banners were removed as evidence related to the crime of vandalism and/or taken down by the janitor

15

during the clean up of the mess related to the vandalism. Chief Yovella testified that he asked Lieutenant Severs to obtain the banners as evidence in the vandalism case. Nowhere in his testimony is there an indication that the removal of the banners was motivated or driven by their message.

Based on the testimony in the record, it is likely that Mr. Nuhn, the janitor, took the banners down as he had them folded up and was ready to throw them away when he turned them over to the University police. It is not clear why he took them down, and no one asked him. In any event, it makes no difference whether they were taken down by a University police officer or by the janitor because there is no showing that the reason for the removal of the banners was the message they conveyed. Absent evidence to the contrary, the court will not conclude that the banners were taken down because of their content. Therefore, the First Amendment is not implicated, and plaintiff's First Amendment rights were not violated by the removal of the banners.

## C. Plaintiff's Person

Plaintiff also contends that his Fourth Amendment rights were violated because there was no probable cause to arrest him. Defendants argue that plaintiff is estopped from challenging the validity of his arrest because he pled guilty to evading arrest and the charges of public intoxication and vandalism were dismissed as part of his plea.

The Fourth Amendment secures a person's right to be free from unreasonable

16

searches and seizure. Any arrest requires probable cause. *See Centanni v. Eight Unknown Officers*, 15 F.3d 587, 592 (6th Cir. 1994). "[A] warrantless arrest must be supported by the existence of probable cause of sufficient weight to support a belief that the *individual detained committed a criminal offense*." *United States v. McNeal*, 955 F.2d 1067, 1071 (6th Cir. 1992) (emphasis in original). As long as there is probable cause to make an arrest, a warrantless arrest does not violate the Fourth Amendment. *U.S. v. Strickland*, 144 F.3d 412, 415 (6th Cir. 1998) (citing *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988)). However, an arrest without probable cause does violate the Fourth Amendment. *Crockett v. Cumberland Coll.*, 316 F.3d 571, 580 (6th Cir. 2003).

Plaintiff cannot prevail on his Fourth Amendment claim that there was no probable cause to arrest him because the issue of probable cause was addressed and resolved in plaintiff's state court criminal proceedings. Plaintiff was charged with evading arrest under Tennessee Code Annotated § 39-16-603. That provision provides in part:

> (a)(1) Except as provided in subsection (b), it is unlawful for any person to intentionally flee by any means of locomotion from anyone the person knows to be a law enforcement officer if the person:
>
> (A) Knows the officer is attempting to arrest the person; or
>
> (B) Has been arrested.
>
> (2) It is **a defense to prosecution under this subsection (a) that the attempted arrest was unlawful**.

Tenn. Code Ann. § 39-16-603 (emphasis added). Furthermore, plaintiff pled guilty to

evading arrest, and a judgment was entered against him. Thus, the lawfulness of plaintiff's arrest was squarely before the state court.

In a case very much analogous to the circumstances in this case, Judge Edgar of this court determined that a plaintiff's Fourth Amendment claim for false arrest brought pursuant to § 1983 was precluded by the state court criminal proceedings involving the plaintiff. *Cunningham v. Sisk*, No. 1:01-CV-182, 2003 WL 23471541 (E.D. Tenn. Dec. 4, 2003), *aff'd*, 2005 WL 1285649 (6th Cir. May 18, 2005). The plaintiff in *Cunningham* was arrested for speeding, and his car was searched incident to the arrest. He brought a § 1983 action claiming that he was falsely arrested and searched without probable cause. Judge Edgar held that the issue of probable cause had been determined in the state court criminal proceedings and Cunningham was collaterally estopped from relitigating the probable cause issue.

Cunningham had a preliminary hearing at which he contested and litigated the issue of probable cause, and the state court determined that there was probable cause to bind the case over to the grand jury. Cunningham pled guilty and was convicted in state court on the charge of speeding, and a judgment of conviction was entered.

Judge Edgar determined that "[i]ssues decided in state court criminal proceedings may preclude relitigation of the same issues in a subsequent action brought in federal court under 42 U.S.C. § 1983." *Id.* at *6 (citing *Allen v. McCurry*, 449 U.S. 90, 94-96, 101 S. Ct. 411, 414-16, 66 L. Ed. 2d 308 (1980)). He looked to Tennessee law on collateral

estoppel, found that all the elements were met, and decided that the Tennessee doctrine of defensive collateral estoppel gave "preclusive effect to the prior state-court determination that there was probable cause to arrest Cunningham for speeding, and to Cunningham's guilty plea and judgment of conviction on the speeding charge." *Id.* at *7. Judge Edgar concluded that this court was bound by the state court decision that there was probable cause to arrest Cunningham.

In addition, Judge Edgar held that "Cunningham's guilty plea and judgment of conviction on the speeding charge in state court also estopp[ed] him from claiming he was falsely arrested without probable cause in violation of the Fourth Amendment." *Id.* at *8 (citing *Walker v. Schaeffer*, 854 F.2d 138, 142-43 (6th Cir. 1988)). In *Walker*, the issue before the Sixth Circuit was whether a plea of nolo contendere made by a criminal defendant in state court precluded that defendant from asserting in federal court that the police lacked probable cause to arrest him. The plaintiffs in *Walker* had pled no contest to charges of disorderly conduct and reckless driving. They then brought a § 1983 action claiming that there had not been probable cause to arrest them. The Sixth Circuit reversed the district court and held that the nolo contendere pleas made by the plaintiffs in the state court criminal proceedings precluded them from asserting in federal court that the officers had lacked probable cause to arrest them.

Judge Edgar also found that defensive collateral estoppel was appropriate under Tennessee law where Cunningham had pled guilty and was convicted of a criminal charge and then sought damages in civil litigation concerning the exact same transaction by claiming

19

he did not commit the criminal act. Collateral estoppel was appropriate to prevent Cunningham "from repudiating his guilty plea and attacking the validity of his state-court judgment of conviction." *Cunningham*, 2003 WL 23471541 at *8.[5]

The court has considered the analysis and authorities employed by Judge Edgar in *Cunningham* and concludes that they apply with equal force in this case. The court concludes that plaintiff had a full and fair opportunity at his state court criminal proceedings to litigate the issue of whether there was probable cause to arrest him when he defended the evading arrest claim. He chose to plead guilty to evading arrest, and a judgment was entered against him. This court is bound by that state court determination. In addition, application of Tennessee law on collateral estoppel is appropriate, and plaintiff is precluded from asserting in this court that Officer Cummings lacked probable cause to arrest him. To find otherwise would permit plaintiff to repudiate his guilty plea and the facts pertaining to it.

Plaintiff argues that because his record has been expunged based on his diversionary plea he can raise the probable cause issue. The court disagrees. Plaintiff did

---

[5] Judge Edgar included the following quotation that the court finds equally relevant and cogent in this case:

> Particularly galling is the situation where a criminal convicted on his own guilty plea seeks as plaintiff in a subsequent civil action to claim redress based on a repudiation of the confession. The effrontery, or as some might say it, *chutzpah*, is too much to take. There certainly should be an estoppel in such a case.

*Id.* (citations omitted).

not receive pre-trial diversion but judicial diversion. Judicial diversion is similar to pre-trial diversion except that the discretion for its use lies with the trial court "and it is effective only after the defendant is found guilty." *State v. Carr*, 861 S.W.2d 850, 858 (Tenn. Crim. App. 1993). While the plaintiff was given the opportunity to have his record expunged by the state trial judge, he still pled guilty to evading arrest, and a judgment was entered against him. This court is not going to disregard plaintiff's admissions and allow him to repudiate his guilty plea in order to relitigate the circumstances surrounding his arrest and the issue of probable cause. Plaintiff's guilty plea, even though it involved judicial diversion, still has the same effect and precludes plaintiff from pursuing a Fourth Amendment claim for unlawful arrest.[6]

In any event, there was probable cause to arrest the plaintiff. Probable cause to arrest has been defined as "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S. Ct. 2627, 2632, 61 L. Ed. 2d 343 (1979). "[T]he existence of probable cause should be determined by the totality of the circumstances. This totality of the circumstances analysis includes a realistic assessment of

---

[6] As discussed above in *Walker*, a nolo contendere plea is given the same preclusive effect as a guilty plea. In addition, pretrial diversion agreements have also been given preclusive effect, operating as convictions for the purposes of precluding a subsequent civil action for damages. *Roesch v. Otarola*, 980 F.2d 850, 853 (2nd Cir. 1992); *Swanson v. Fields*, 814 F. Supp. 1007, 1014-16 (D. Kan. 1993), *aff'd* 13 F.3d 407 (10th Cir. 1993).

the situation from a law enforcement officer's perspective." *United States v. Ferguson,* 8 F.3d 385, 392 (6th Cir. 1993) (citations omitted). "The probability of criminal activity is assessed under a reasonableness standard based on 'an examination of all facts and circumstances *within an officer's knowledge at the time of an arrest*.'" *Crockett*, 316 F.3d at 580 (quoting *Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999) (emphasis in original).

Application of these principles to the facts in this case demonstrates that probable cause existed to arrest the plaintiff. At approximately 3:00 a.m., Officer Cummings was dispatched to the Art and Architecture Building on a report of vandalism. When he arrived, he saw the plaintiff through the windows and his exit from the building. Once the plaintiff was stopped, he was identified by the janitor who had reported the vandalism and had seen the plaintiff and his friends in the building. In addition, the plaintiff had yellow paint on his hands, he smelled of alcohol, and he had blood shot eyes. Based on the totality of the circumstances and the facts known by Officer Cummings at the time of the arrest, the court finds that it was reasonable for Officer Cummings to conclude that plaintiff was probably involved in the reported crime. Therefore, there was probable cause to arrest the plaintiff.

For all the foregoing reasons, defendants' motion for summary judgment will be granted, and this case will be dismissed. An order reflecting this opinion will be entered.

ENTER:


_____s/ Leon Jordan_____
United States District Judge

23